819 A.2d 447 (2003)
359 N.J. Super. 162
Cindylu ENTROT, Plaintiff-Appellant,
v.
The BASF CORPORATION, Defendant-Respondent, and
George Molinet, Defendant/Third-Party Plaintiff,
v.
Michael Entrot, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 2003.
Decided April 7, 2003.
*449 Gerald Jay Resnick, West Orange, argued the cause for appellant (Deutsch Resnick, attorneys; Mr. Resnick and Andrea Rachiele, on the brief).
Gregory C. Parliman, Morristown, argued the cause for respondent (Pitney, Hardin, Kipp & Szuch, attorneys; Theresa Donahue Egler and Debra Christenson Forster, on the brief).
Before Judges KESTIN, FALL and WEISSBARD.
*448 The opinion of the court was delivered by WEISSBARD, J.A.D.
Plaintiff, Cindylu Entrot, appeals from an order of summary judgment dismissing her complaint against defendant, her former employer, the BASF Corporation, alleging violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. The complaint was based upon a theory of hostile work environment resulting from sexual harassment by a co-worker, George Molinet. Molinet was originally named as a defendant but plaintiff's claim against him was settled. The trial court granted summary judgment to defendant on alternative grounds: 1) the co-worker was not plaintiff's "supervisor" and thus the employer could not be vicariously liable for the co-worker's harassing conduct; or 2) even if the co-worker was a "supervisor," plaintiff failed to establish sufficient fact questions regarding the employer's vicarious liability. For reasons which follow, we reach a contrary conclusion as to both questions in the context of summary judgment and therefore reverse and remand.
To resolve this appeal we are required to explore the parameters of the term "supervisor" as it is employed in LAD cases for the purpose of imposing vicarious liability on an employer and to determine the availability to an employer of the defense recognized by the United States Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), in cases where the employee is constructively discharged due to a hostile work environment.
Our disposition requires that we set out the facts in some detail.[1] Plaintiff, holder of a Master's degree in management, was hired by defendant in 1988 as a Group Information Systems manager of the Polymers Division. She reported to Carol Dechert-Lizzi and later to Steven Bishop. In February 1996, she asked to be and was assigned to a temporary project involving the implementation of a new business software called "SAP." She retained some of her former responsibilities until June 1996, when she began working full-time on the SAP project.
On the SAP project, plaintiff was one of five team leaders and the "project leader" was George Molinet, whose duties were to set priorities for the team, schedule implementation dates, and help make strategic decisions. According to plaintiff and disputed by defendant, Molinet also wrote her job description and "was responsible for directing and evaluating her job *450 performance." Nonetheless, it was undisputed that "Molinet never completed a performance evaluation for plaintiff."
Defendant alleged, and plaintiff denied, that during the first half of 1997 the SAP project required plaintiff and others with the project to make numerous business trips, during which she and her colleagues socialized and drank more than usual, and plaintiff and Molinet began an intimate, sexual relationship, often spending time in each other's hotel rooms. During a trip to Charlotte, North Carolina in May 1997, Molinet gave plaintiff a bottle of perfume as a birthday gift. Plaintiff alleged that she at first refused the gift, but accepted it after Molinet "insisted." Plaintiff admitted that on May 13, 1997, the day plaintiff learned of her promotion to Manager, Division of Information Technology, Molinet came to her hotel room and had a bottle of champagne delivered to the room. Plaintiff also alleged that Molinet wrote love poems to her. Molinet told plaintiff that "he was in love with her and was considering divorcing his wife."
On June 10, 1997, plaintiff and Molinet were attending a conference in North Carolina when plaintiff's husband, Michael, called her, "crying" and asking her to come home because "someone had called him that morning and told him that plaintiff was having an affair with Molinet." According to plaintiff's friend, Lynn Pridmore, plaintiff called her before leaving the hotel, telling her that she might come to Pridmore's that night, but Pridmore said she could not accommodate plaintiff. Plaintiff told Pridmore that if she did not hear from plaintiff within a day, "she should call the police and assume she was dead." Molinet drove plaintiff to the airport.
According to Michael, on the next day, June 11, he left a message on Molinet's answering machine:
George, this is Mike Entrot, stay the fuck away from my wife. I don't want no contact with you through e-mail, voice-mail, anything else, just stay the fuck away from her if you understand what's good for you.
Michael left a similar warning on June 23. He also claimed to have called Molinet's wife.
Between June 10 and early July 1997, defendant alleged that "plaintiff left a series of voice-mail messages for Molinet" telling him how much she missed him. Plaintiff admitted calling Molinet but had "no recall of any messages left."
Defendant alleged that it had a Sexual Harassment Policy that it distributed to all employees, which declared a no-tolerance policy for sexual harassment. The policy set forth a complaint procedure:
If you are subjected to any form of sexual harassment in connection with your employment, you should report it to the appropriate level of supervision or the Human Resources Department immediately. Individuals who violate this policy will be subject to disciplinary action up to and including termination of employment.
Plaintiff admitted that she "was vaguely aware ... that BASF had a policy," and also that she had attended a training session about the policy. It was undisputed that plaintiff never used the complaint procedure or any other means to report Molinet's alleged harassment.
Plaintiff was on vacation with Michael during the first two weeks of July 1997, and she was scheduled to return to work on July 14. But on that day Michael called plaintiff's supervisor, Dechert-Lizzi, to report that plaintiff "was being stalked" by Molinet. Plaintiff then took the phone and told Dechert-Lizzi that "she could not return to work with Molinet." While *451 plaintiff told Dechert-Lizzi about Molinet stalking her, she never mentioned "the sexual conduct between her and Molinet."
A corporate security officer called plaintiff in response to her conversation with Dechert-Lizzi; while plaintiff reiterated her allegations, she did not mention any sexual conduct and insisted that the company not contact Molinet about her allegations. In fact, she expressly denied that Molinet had "made [any] overt sexual or suggestive comments [or] asked her out or anything of that nature." Plaintiff explained that "she was afraid to report Molinet for fear of retaliation and because she was told not to by the police."
Also on July 17, 1997, plaintiff and Michael filed a complaint with the police that Molinet had been harassing her after plaintiff told Molinet that she wanted to end the intimate relationship that had developed while the two were together on business trips.
Notwithstanding plaintiff's request, on July 24, 1997, Dechert-Lizzi and a company security officer met with Molinet, who admitted that "he and plaintiff had shared a `more than professional relationship,' but only `after hours while they were traveling.' " Molinet promised that in the future he would relate to plaintiff on a professional basis only.
Plaintiff last came to work on July 22, 1997, beginning a disability leave the next day; she never returned to work. She had been under psychiatric treatment by Dr. Robert Parinello since July 1997. Parinello diagnosed her with Bipolar Disorder, a disease for which plaintiff had a "genetic predisposition," and which had come "`to the fore' in April 1997 because of a number of stressors, including plaintiff's frequent business trips, her heavy work load, and the larger-than-usual amount of drinking on her business trips." And he "agreed that plaintiff's husband's discovery of her relationship with Molinet was `a powerful stressor.'"
Parinello deposed that plaintiff's relationship with Molinet "made her feel `like a teenager,' as if she were involved with her `first love.'" Parinello reported that she told him that she hated her mother and her husband, and that she was "infatuated" with Molinet, who was "madly in love" with her. Parinello opined that Molinet "exploited" her, which he was able to do because plaintiff's "manic" state made her "easy prey."
In April 1999, plaintiff filed a Law Division complaint against defendant and Molinet, alleging:
Count one: sexual harassment, hostile work environment, and constructive discharge, as prohibited by the LAD;
Count two: intentional infliction of emotional distress;
Count three: assault and battery by Molinet.
In its answer, defendant denied the key allegations and asserted various defenses. Molinet filed a separate answer that included a counterclaim against plaintiff and a third-party complaint against plaintiff's husband, Michael Entrot. By stipulation the third-party complaint was dismissed with prejudice.
After extensive discovery, in July 2001 both defendant and Molinet filed separate motions for summary judgment, which were opposed by plaintiff. By letter opinion of October 4, 2001, the judge granted summary judgment to defendant on all counts on the grounds that: 1) plaintiff had failed to show that Molinet was a "supervisor" for whose conduct defendant could be vicariously liable; or 2) even if Molinet were a "supervisor," plaintiff had failed to meet the proof standard for an employer's liability for sexual harassment by a supervisor. As to Molinet as an *452 individual, the judge granted summary judgment to him on count one (LAD) and denied it on counts two (intentional tort) and three (assault and battery). After denial of her motion for reconsideration, plaintiff filed this appeal.
Plaintiff and Molinet subsequently entered into a settlement agreement. Accordingly, Molinet is no longer in the case.

I
Plaintiff argues that the motion judge erred in ruling as a matter of law that Molinet was not plaintiff's "supervisor" within the meaning of the case law imposing vicarious liability on an employer for sexual harassment by one of its supervisors. She divides her argument into two points: 1) the judge ignored or undervalued evidence from plaintiff that raised disputed fact questions as to whether Molinet was her "supervisor"; and 2) the judge too narrowly construed the meaning of "supervisor" as developed by the case law.
The LAD expressly forbids employment discrimination on the basis of gender. N.J.S.A. 10:5-12a. Claims of sexual harassment under the LAD normally fall into two categories: 1) "quid pro quo," involving express or implied threats by the employer that the employee will suffer adverse employment consequences if he or she refuses to submit to the employer's sexual demands; or 2) hostile work environment, in which the employer or other employees harass an employee because of his or her gender to such an extent that the workplace becomes hostile. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 601, 626 A.2d 445 (1993); Herman v. Coastal Corp., 348 N.J.Super. 1, 18, 791 A.2d 238 (App. Div.), certif. denied, 174 N.J. 363, 807 A.2d 195 (2002). In this case plaintiff relied on the latter theory, alleging that Molinet's sexual advances were unwelcome and rendered the workplace intimidating, hostile and offensive, such that she became emotionally disabled and was constructively discharged.
In order to state a claim for the hostile-work-environment form of sexual harassment, a plaintiff must establish four elements:
[T]he complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a(3) reasonable [employee] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.
[Lehmann, supra, 132 N.J. at 603-04, 626 A.2d 445.]
The motion judge assumed, for the purposes of the summary judgment motion, that plaintiff had sufficiently stated a claim for hostile work environment. But the judge acknowledged that, in order to hold an employer like defendant vicariously liable for that hostile environment, plaintiff had to show that the harassment was done by a "supervisor" who was acting as defendant's agent under traditional agency principles. Lehmann, supra, 132 N.J. at 619-20, 626 A.2d 445; Herman, supra, 348 N.J.Super. at 25, 791 A.2d 238; Shepherd v. Hunterdon Developmental Ctr., 336 N.J.Super. 395, 422-23, 765 A.2d 217 (App. Div.2001), rev'd in part on other grounds, 174 N.J. 1, 803 A.2d 611 (2002). The reason for demanding that the harassing employee be a supervisor, as opposed to a non-supervisory co-worker, is that employers normally do not invest the latter class of employee with any authority that might be used to harass another employee. Heitzman v. Monmouth County, 321 N.J.Super. 133, 145-46, 728 A.2d 297 (App.Div.1999).
Lehmann, supra, 132 N.J. 587, 626 A.2d 445, is the seminal case. There, the Court promulgated an analytical *453 framework for gauging an employer's responsibility for an employee's sexual harassment of another employee, under a hostile environment theory. The Court fashioned two levels of employer liability, depending on the kind of relief demanded. When the issue is equitable reliefsuch as promotion, reinstatement, back pay, or other action needed to remediate a hostile environmentthe employer is strictly liable for a supervisor's sexual harassment, as only the employer has the power to take steps to correct the harm caused by the harassment. Id. at 616-17, 626 A.2d 445. But when a court is asked to assess compensatory and punitive damages as a result of the harassing conduct, an employer's liability for a supervisor's conduct must be gauged under common-law principles of agency, id. at 617, 626 A.2d 445, as reflected in Restatement (Second) of Agency § 219 (1958):
(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) the master intended the conduct or the consequences, or
(b) the master was negligent or reckless, or
(c) the conduct violated a non-delegable duty of the master, or
(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
Under the Restatement test, summarized the Court, an employer will be vicariously liable for a supervisor's conduct outside the scope of employment[2] when "the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." Lehmann, supra, 132 N.J. at 624, 626 A.2d 445.
With respect to the last scenarioaided by the agency relationship (section 219(2)(d) of the Restatement)the Court adopted a four-pronged "fact-specific analysis," by which the fact-finder must decide whether: 1) the employer delegated to the supervisor the authority to control the situation leading to the plaintiff's complaint; 2) the supervisor exercised that authority; 3) an LAD violation resulted; and 4) the authority delegated by the employer aided the supervisor in causing the injury of which the plaintiff complains. Id. at 620, 626 A.2d 445; Gaines v. Bellino, 173 N.J. 301, 313, 801 A.2d 322 (2002); Herman, supra, 348 N.J.Super. at 25, 791 A.2d 238.
Under the foregoing principles, therefore, an employer's liability, whether "strict" or "vicarious," requires first that the harassing employee be a "supervisor." As noted, the motion judge ruled that plaintiff had not established this prerequisite. The judge cited the following as negating plaintiff's claim that Molinet was her supervisor during the time he was the coordinator of the project on which she served as one of the team leaders:
 he was not from plaintiff's department;
 he had no authority to hire, fire or promote her;
 he did not select her for the project;
*454  he had no "significant" input into personnel decisions concerning plaintiff or the other project participants;
 he did not control plaintiff's "day-to-day working environment";
 plaintiff did not report to him "on a daily basis, or seek redress based on workplace issues";
 the project was temporary.
The judge summarized her assessment of Molinet's status:
This was a project of limited duration, for a limited purpose, and with a team "leader" to coordinate, facilitate and direct. It seems in this context to be extending the definition of supervisor too far when a mere temporary project assignment places one employee "in charge of" another. Since the concept for employer liability under LAD is to encourage responsibility for the workplace and place that responsibility within a hierarchy, holding that co-employees can rise to a supervisor status on project-by-project term imposes higher standards of culpability than Lehmann, Cavuoti and Taylor anticipated. Nor should the subjective perspective of the one alleging harassment be determinative. The court should make the decision of the status of the alleged harasser from an objective, factual basis, because that legal determination affects distinctive proof bases of liability on the employer.
Also important, in the judge's view, was that, according to plaintiff's own psychiatrist, Dr. Parinello, "the relationship [with Molinet] was beyond her control or judgment due to the triggering of a latent bipolar disorder," and was exacerbated by "stressors in her life," such as drinking on business trips. The judge concluded that plaintiff's claim of distress from Molinet's status as her supervisor was "not at all consistent with the main theory of psychiatric disability due to manic disorder."
On appeal plaintiff argues that the judge applied an overly narrow definition of "supervisor" by requiring certain indicators not required by the case law, which instead focuses broadly on whether the authority conferred by the employer on the supervisor aided him in engaging in, or granted him the apparent authority to engage in, the offending behavior. Defendant counters that the judge correctly applied the pertinent case law in determining that Molinet's actual functions did not evidence that he was plaintiff's supervisor.
None of the cases squarely defines "supervisor" in this special context. The Court in Lehmann did not attempt a definition, as that status was not disputed in that case. A review of the cases decided since Lehmann shows that supervisory status depends on the nature of the employer's delegation of authority to the harassing co-worker. If the co-worker had the authority to control the work environment, any harassing behavior by him or her will cause the employer to be liable. As we stated in Heitzman, supra, 321 N.J.Super. at 145, 728 A.2d 297 (quoting Lehmann, supra, 132 N.J. at 620, 626 A.2d 445), "[a]n employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor `to control the day-to-day working environment' facilitates the harassing conduct." In Heitzman, therefore, we refused to hold the employer vicariously liable for an alleged anti-Semitic remark by a co-worker who was not a supervisor of the plaintiff. Id. at 146, 728 A.2d 297.
In Taylor v. Metzger, 152 N.J. 490, 508, 706 A.2d 685 (1998), the Court held that a single racial slur by a county sheriff directed to a subordinate was sufficient to establish at least a jury question on whether the *455 slur created a hostile work environment. Though Taylor was not a vicarious liability case, the Court's dicta about a supervisor's role suggests that it is the supervisor's power to shape the workplace atmosphere that is the key determinant of liability. Thus, the Court observed:
A supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace. See Lehmann, supra, 132 N.J. at 622-23, 626 A.2d 445 (holding an employer was vicariously liable for sexual harassment if it had knowledge of the harassment but failed to stop it promptly and effectively).
[Id. at 503-04, 706 A.2d 685.]
And it is a supervisor's power and authority that renders his or her offensive conduct particularly damaging and hence remediable under the LAD:
The Sheriff of Burlington County is a high-ranking law enforcement officer. That fact is of significance when evaluating the effect of his remark on a subordinate. Any remark from such an individual carries with it the power and authority of the office. Because the Sheriff was both plaintiff's superior and her offender, plaintiff could not seek the redress that would otherwise be available to a victim of invidious workplace harassment, namely, resort to her own supervisor.
[Id. at 505, 706 A.2d 685.]
In Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 735 A.2d 548 (1999), the Court considered what kind of employer qualifies as "upper management" for the purposes of deciding whether a prevailing plaintiff may recover punitive damages against the employer. The Court in Lehmann had held that, in order for an employer to be liable for punitive damages (as opposed to compensatory damages), there had to be actual participation or willful indifference by "upper management." Lehmann, supra, 132 N.J. at 625, 626 A.2d 445. The Cavuoti Court defined "upper management" as including not only the top level of managers, but also the "second tier" of managerial employees who "have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace." Cavuoti, supra, 161 N.J. at 129, 735 A.2d 548.
By way of dicta the Court distinguished a "supervisor," who is lower than "upper management" and whose conduct would not expose an employer to liability for punitive damages, but rather to compensatory damages only. Id. at 124-25, 735 A.2d 548. Thus, the Court observed that "functional assignments are immediately relevant in determining who is a supervisor for purposes of vicarious liability for compensatory damages." Id. at 124, 735 A.2d 548. And it reviewed federal cases under Title VII of the Civil Rights Act in which the courts focused not on whether the supervisor had the final authority to hire, fire, or promote, but rather on whether he or she had significant input into personnel decisions such that the harassed employee would feel threatened by the harassing conduct. Id. at 124-25, 735 A.2d 548.
In Herman v. Coastal Corp., supra, 348 N.J.Super. at 27-28, 791 A.2d 238, the plaintiff sued a co-worker under the section of the LAD that allows recovery against an individual co-worker who aids or abets an act of sexual harassment. N.J.S.A. 10:5-5e. We ruled that in order to be liable under that subsection, the co-worker would have to be a "supervisor" *456 within the meaning of Heitzman and Cavuoti. The offending co-worker in Herman was not a "supervisor" of the operations unit (SRU) in which the plaintiff worked:
Mark Schools, as a temporary supervisor of the SRU, had insufficient supervisory authority over plaintiff to trigger supervisory liability. Schools had no power to hire, fire, impose discipline, conduct evaluations, or set other terms and conditions of employment. He merely directed the technical aspects of the SRU.
[Id. at 28, 791 A.2d 238.]
Like the LAD, the cognate federal law, Title VII, does not define "supervisor" for the purpose of assessing an employer's vicarious liability. Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1033 (7th Cir.1998). Nor has the Supreme Court yet devised a definition. One federal court has observed that "[d]etermining whether an employee is a supervisor as opposed to a mere co-worker has been a tricky business for courts." Schele v. Porter Mem. Hosp., 198 F.Supp.2d 979, 989 (N.D.Ind.2001). The federal courts appear to have split into two camps, one focusing on power to make key personnel decisions and the other on power to direct on-the-job activities. On the one side is the Seventh Circuit, represented by Parkins, supra, 163 F.3d at 1034:
[T]he essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer.
Under the Parkins approach, a "group leader" having no authority to affect an employee's conditions of employmentalbeit possessing some authority to oversee the employee's performancewould not qualify as a "supervisor." Durkin v. City of Chicago, 199 F.Supp.2d 836, 847-48 (N.D.Ill.2002). Such "marginal discretion" by a "low-level supervisor" is not enough to trigger an employer's vicarious liability. Id. at 848. "An individual is not a supervisor unless he possesses the authority to directly affect the terms and conditions of a victim's employment." Hall v. Bodine Elec. Co., 276 F.3d 345, 355 (7th Cir.2002). See also Highlander v. K.F.C. Nat'l Mgmt. Co., 805 F.2d 644, 648 (6th Cir.1986).
Competing with the Parkins approach is the camp represented by District Courts in the Eleventh Circuit, beginning with Sims v. Montgomery County Comm'n, 766 F.Supp. 1052 (M.D.Ala.1990), which applied principles of agency law under Restatement (Second) of Agency § 219(2)(d)(1958), as previously explained in Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1559 (11th Cir.1987). That position was elaborated upon in Dinkins v. Charoen Pokphand USA, Inc., 133 F.Supp.2d 1254, 1266 (M.D.Ala.2001), in which the court rejected any requirement that a supervisor must have the power to hire, fire, or discipline. One may also be a "supervisor," ruled the court, if one is empowered "to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks." Ibid. (citations omitted). The court acknowledged an additional basis for qualifying as a "supervisor": when the harassing employee, while not really a "supervisor," has "apparent authority" that causes the victim to reasonably believe that the harasser possesses supervisory powers. Ibid.
*457 In reaching that conclusion, Judge De Ment, noted, but rejected, the Parkins approach as follows:
Although Parkins is appealing because it establishes simple rules for complex cases, the court believes that it improperly truncates the Supreme Court's holdings in Faragher and Ellerth. These companion cases clearly indicate that an analysis of employment relationships involves multi-factorial analysis rather than simplistic taxomony. See Faragher, 118 S.Ct. at 2288 (eschewing "mechanical application" of factors); Ellerth, 118 S.Ct. at 2268-69 (same).
In this Circuit, as Judge Thompson noted long ago, "[a] supervisor need not necessarily be high in the business structure, nor does he have to have the authority to hire, fire, or promote in order to be considered an agent whose conduct is binding on an employer." Sims, 766 F.Supp. at 1069; see also Faragher v. City of Boca Raton, 864 F.Supp. 1552, 1563-64 (S.D.Fla.1994), aff'd, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); [Meritor Savings Bank v. Vinson, 477 U.S. 57, 76, 106 S.Ct. 2399, 2410, 91 L.Ed.2d 49, 65 (1986)] (Marshall, J., concurring). ("A supervisor's responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions," but contemplate "the day-to-day supervision of the work environment and with ensuring a safe, productive workplace."); Saville v. Houston County Healthcare Authority, 852 F.Supp. 1512, 1527 (M.D.Ala. 1994) (supervisors include those who watch over workers' assignments); Grozdanich v. Leisure Hills Health Ctr., Inc., 25 F.Supp.2d 953, 973 (D.Minn. 1998) (same). To the extent that the Seventh Circuit has held to the contrary, its rulings are neither binding nor persuasive.
The court finds that an employee is a supervisor or "agent" for purposes of Title VII if he has the actual authority to take tangible employment actions, see Ellerth, 524 U.S. at 762, 118 S.Ct. 2257, 141 L.Ed.2d 633, or to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker, see id., or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks, see [Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 513 (11th Cir.2000)].

[Id. at 1266.]
The Dinkins approach represents, as one court put it, "a more indulgent line of case authority." Grozdanich v. Leisure Hills Health Center, Inc., supra, 25 F.Supp.2d at 972. In Mikels v. City of Durham, 183 F.3d 323 (4th Cir.1999), the Fourth Circuit divined the following guidance from the Ellerth and Faragher opinions as to what type of conduct by "one having some measures of supervisory authority" over a sexual harassment victim can be found to have been "aided by the agency relation." Id. at 333. Noting that "the inquiry may have to run deeper into the details of relationships and particular circumstances," ibid., the court laid out the following guidelines:
The touchstone, though not a prescription, can be found in critical observations by the Ellerth and Faragher courts respecting the way in which the agency relation may aid a particular "supervisor" in a particular act of actionable harassment. The determinant is whether as a practical matter his employment relation to the victim was such as to constitute a continuing threat to her employment *458 conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a mere co-worker would not. See Faragher, 118 S.Ct. at 2291 (because "victim may well be reluctant to accept the risks of blowing the whistle on a superior ..." [and] "generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker"). The most powerful indicator of such a threat-induced vulnerability deriving from the supervisor's agency relation lies in his authority, though not exercised in the particular situation, to take tangible employment actions against the victim, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See Ellerth, 118 S.Ct. at 2268-69 (so defining this level of authority as necessarily derived from the agency relation); Faragher, 118 S.Ct. at 2293 (imposing aided-by-agency vicarious liability where no tangible employment action taken but one of two harassing supervisors had authority to hire and fire, both had "virtually unchecked authority" over subordinates, "directly controlling and supervising all aspects of [the victim's] day-to-day activities," and victim and colleagues were "completely isolated from the [employer's] higher management").
Short of that most threatening form of supervisory authority, we may assume, without deciding here, that lesser forms derived from the agency relation may aid particular acts of supervisor harassment. In such less clear circumstances, the victim's response in context maybe highly probative on the issue whether any agency authority possessed by the harasser has actually aided his conduct by increasing her sense of vulnerability and defenselessness. This point was anticipated, though obliquely, in Faragher. There the Court noted that "when a fellow-employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor `whose power to supervise[which may be to hire and fire], and to set work schedules and pay ratesdoes not disappear when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion.'" Id. at 2291 (quoting Estrich, Sex at Work, 43 Stan. L.Rev. 813, 854 (1991)). Which is to suggest that where the level of authority had by a harasser over a victimhence her special vulnerability to his harassmentis ambiguous, the tip-off may well be in her response to it. Does she feel free to "walk away and tell the offender where to go," or does she suffer the insufferable longer than she otherwise might?
[Id. at 333-34 (alterations in original).]
See also Homesley v. Freightliner Corp., 122 F.Supp.2d 659, 662-64 (W.D.N.C. 2000).
The Dinkins approach has been adopted by the Equal Employment Opportunity Commission in its enforcement guidelines:
An individual qualifies as an employee's "supervisor" if:
a. the individual has authority to undertake or recommend tangible employment decisions [e.g., hiring, firing, promoting, demoting, reassigning] affecting the employee; or
b. the individual has authority to direct the employee's daily work activities.
[EEOC Enforcement Guidance, No. 915.002 III.A. (June 18, 1999).]
According to this guideline, a mere coordinator of a special project would not qualify under category b:

*459 [S]omeone who merely relays other officials' instructions regarding work assignments and reports back to those officials does not have true supervisory authority. Furthermore, someone who directs only a limited number of tasks or assignments would not qualify as a "supervisor." For example, an individual whose delegated authority is confined to coordinating a work project of limited scope is not a "supervisor."
[EEOC Enforcement Guidance, supra, III.A.2.]
To date our Supreme Court has not been called on to choose between these two competing views, or to formulate some other approach. Our task is to predict how the Court would fill this analytical vacuum. Shackil v. Lederle Laboratories, 219 N.J.Super. 601, 621, 530 A.2d 1287 (App.Div.1987), rev'd on other grounds, 116 N.J. 155, 561 A.2d 511 (1989).
Our reading of Lehmann and its progeny, reviewed above, suggests that the Court, instead of requiring a litmus test depending on specific factors (e.g., power to fire or power to control daily tasks), would make the decision turn on whether the power the offending employee possessed was reasonably perceived by the victim, accurately or not, as giving that employee the power to adversely affect the victim's working life. Thus, such indicia as the power to fire and demote, to influence compensation, and to direct all job functions would be probative of supervisory status, but would not exclude other indicia. Also relevant would be any evidence that the alleged harasser controlled the workplace in subtler and indirect ways, as long as the effect was to restrict the victim-employee's freedom to ignore sexually harassing conduct. Essentially, this is the Dinkins approach as opposed to the more rigid Parkins analysis. We find support for this view in the fact that Mikels; Grozdanich, and Sims were among the decisions cited with approval by the Court in Cavuoti, supra, 161 N.J. at 124-25, 735 A.2d 548.
The following facts, drawn from deposition testimony, are pertinent to Molinet's status as "supervisor" in this special context. In our view, the testimony, considered as a whole and giving plaintiff the benefit of all favorable inference, amply establishes at least a jury question on the "supervisor" issue.
In her various depositions, plaintiff described her professional status with respect to Molinet. He was "the overall team leader" of the SAP project (also called the NV Vision `96 project), which began in February 1996. She was "a team leader taking directions from George Molinet," meaning, "[h]e would assign [plaintiff] projects, [and] tasks. Provide input, tell [her] what to do and how to do it. When to do it. Where to do it." Until about February 1997 Molinet had been "adversarial" with plaintiff and her staff, but he gradually changed toward her in early 1997 to be more deferential toward her and to ask her to lunch to discuss business. Nonetheless, she felt his change was a "facade" and she still felt fearful of him, based on her experience with how he intimidated and manipulated people.
When plaintiff joined the SAP project in February 1996, her supervisor at that time, Steve Bishop, told her that she "would be reporting to George," who would be doing her "performance review for `96, `97."[3] Molinet once said to plaintiff and to others on the project, "I'm the boss, I have 51% of the vote, I can get you thrown off this project anytime I want."
Plaintiff elaborated:

*460 He would remind me that he's my boss. He put me in fear that if I didn't do as he said, or didn't ... follow his instructions precisely, that he could ruin my career.... He told me if I didn't do as he wished, that he could make it very difficult for me.
While Molinet never expressly threatened to fire or demote her, he "put enough fear in [her] to make [her] afraid that he would pull [her] out of the team leader position." He had the authority to do that, in plaintiff's opinion, because he was the "coordinator, leader of the project." She added, "I was afraid that he would ruin my marriage, that he would ruin my reputation and everything I worked so hard for."
Molinet began playing "mind games" with her in order to get her to do what he wanted. For example, he would tell her that her father, who was deceased, had asked him to take care of her. "He would always make sure that I knew he was the boss, that he was in charge. If I did what he said, that things would be okay." Whereas she had been self-confident, Molinet made her feel that she was incapable, which she said, "just destroyed me and my ability to think and make decisions and functions as I once had." He would continually remind her that he was her boss, both to her and during meetings and discussions with others.
She detailed her state of mind during May and June 1997:
I was in thisthis manic state, if you will, extremely vulnerable. I had been beaten down, if you will psychologically, by Mr. Molinet for months and months and months. and by this point, anything and everything he said I believed to be true.
So when he said my father was watching over me, it put me in such an emotional state, as I stated before, speaking about my father is extremely emotional. Itit touched me very deeply, and it put me in that even more powerless position. It justI was over taken by the emotion of my father at that time.
Molinet deposed that he first declared his love for plaintiff in plaintiff's room at a hotel in Charlotte on April 30, 1997. Plaintiff deposed that he started hugging and kissing her and pushed her down onto the bed. Plaintiff tried to stop him but she felt psychologically "powerless" as a result of Molinet's intimidating tactics over the previous months. She was "afraid of the consequences" of doing "anything to anger him." Eventually Molinet stopped groping and left.
Molinet continued to force his affections on plaintiff, short of sexual acts, several times in May 1997 while on business trips; each time plaintiff tried to resist but she felt "powerless." On May 15, 1997, Molinet told plaintiff that he was willing to move plaintiff into the office next to his and to get her "promoted to junior executive." On May 17, Molinet invited plaintiff to his hotel room to discuss the next day's meeting. When plaintiff got to his room, Molinet put on a pornographic movie and proceeded to grope her again.
Molinet's first sexual encounter with plaintiff was on May 27, when he again beckoned plaintiff to his room. She went because she "was afraid of the consequences" of turning him down. In his room, Molinet pushed her head down to his exposed penis and forced her to put his penis in her mouth. He then guided her mouth up to his nipple. On May 30, Molinet came to plaintiff's room; she let him in because she "was threatened by him." She did not describe what happened on that visit.
Sometime in June 1997, in plaintiff's hotel room, Molinet stripped her and put her in the shower. She was "unable to *461 fight back" because she was in "that hypnotic, zombie like state" caused by Molinet's psychological power over her.
Dechert-Lizzi, who provided "general oversight" over the SAP project, deposed that one of Molinet's duties was to gather information from other project members, such as plaintiff, and submit periodic reports to her on the progress of the project. She testified that she was plaintiff's boss. On the company hierarchy of jobs, Molinet was higher than plaintiff. As the SAP project neared completion, Molinet recommended to Dechert-Lizzi that plaintiff be promoted to a position that plaintiff did start in June 1997.
Another member of the project team, Kelly Randis, deposed that Molinet was in charge of the project, and that he, therefore, was plaintiff's supervisor on the project. Plaintiff "had to run decisions about the project through George." Randis did not think that Molinet had the authority to fire plaintiff, but he did have "input" into her performance reviews, and "he could bring her up for disciplinary" action.
In his deposition, Molinet stated that he was the one who chose the members of the SAP project, which he did by asking the four vice presidents to select a candidate. He denied that he was plaintiff's boss on the project. He did meet with a company employee about giving project members a "small stipend" or cash bonus.
We agree with plaintiff that the motion judge seems to have relied on Molinet's depositions only. Indeed, in her opinion, the judge cited excerpts from Molinet's testimony to support her conclusion that he had no control over the daily working environment and had no significant input into personnel decisions. The judge cited none of the testimony of plaintiff, Dechert-Lizzi or Randis. Yet each of them attributed at least some supervisory role to Molinet.
In weighing Dr. Parinello's deposition testimony, the judge stressed that "[t]he psychiatrist does not place emphasis on any type of supervisory role by Mr. Molinet." But Parinello did depose that Molinet "was sort of a boss figure in her life."
Most important was plaintiff's claim that Molinet directly invoked his job authority over plaintiff as a way to coerce her to submit to his sexual advances. Whether a jury will find her credible on that point is another issue. But for the purposes of deciding whether there was a disputed fact question on the matter, the evidence was sufficient to withstand summary judgment. We conclude that the motion judge inappropriately proceeded to weigh the evidence and decide a key fact issue and in doing so she ignored significant testimony favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). When that favorable testimony is added to the testimony of Molinet on which the judge relied, we conclude that the evidence was not so one-sided as to compel judgment for defendant. Ibid.

II
Had the "supervisor" issue been the only issue decided by the judge, the judgment would have to be reversed and the matter remanded for trial. But the judge rested on an alternative ground for granting summary judgment to defendant: assuming Molinet was a "supervisor," plaintiff failed to establish that defendant was liable for Molinet's harassment under the principles adopted in Lehmann. We therefore proceed to address that ground since if the judgment can be affirmed on the alternative ground, the motion judge's error with respect to the "supervisor" issue will be of no consequence. However, we conclude that the summary judgment is *462 reversible on the alternative ground as well.
Plaintiff challenges the motion judge's alternative ground that, even if Molinet were plaintiff's supervisor, plaintiff still failed to meet the proof standard for holding an employer vicariously liable for sexual harassment by a supervising employee. She factors her challenge into two points: 1) the judge improperly made findings of fact and credibility; and 2) the judge wrongly invoked a defense that has been recognized in federal cases but not by New Jersey courts, namely the plaintiff's failure to use the employer's sexual harassment complaint policy.
As noted above, the Court in Lehmann set forth the test governing employer liability in this context. Once it is determined that the harassing employer was a "supervisor," as to which we have concluded that factual issues were presented, the employer's liability is judged by section 219(2) of the Restatement, which the Lehmann Court summarized as whether "the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." Lehmann, supra, 132 N.J. at 624, 626 A.2d 445.
The judge acknowledged the Lehmann test, but made no attempt to explain her reasons for concluding that "plaintiff cannot meet any proof standard that defendant should be held responsible under NJLAD." Rather, her only analysis of the Lehmann factors comprised two conclusory sentences: "There was no constructive or actual knowledge of the actions of Mr. Molinet. There is no proof that [defendant] aided or abetted his actions."
While her language was ambiguous, the judge also apparently rejected plaintiff's claim that she was constructively discharged, finding that plaintiff left work for good in July 1997 "because she had the emotional breakdown from the affair itself," as opposed to from any harassing conduct by Molinet. Again she relied on Parinello's testimony about plaintiff's latent mental disorder.
Having held that the proof requisites of Lehmann were not met, the judge need not have considered whether defendant had a valid affirmative defense to the claim of vicarious liability. Nonetheless, the judge's main rationale, and the only one she explained, was that defendant was entitled to the benefit of the affirmative defense recognized by the United States Supreme Court for vicarious liability claims under Title VII of the federal Civil Rights Act of 1964, namely that the employer had a procedure for reporting and correcting harassing behavior, but the employee unreasonably failed to take advantage of it. In reaching that conclusion, the judge cited the Ellerth and Faragher cases. We will first discuss that portion of the judge's ruling.
The judge reasoned that the defense was applicable here because defendant did have a sexual harassment policy in place, and, even though plaintiff was familiar with it, she did not invoke the available procedures or otherwise report Molinet's alleged harassment. The judge concluded that "[h]olding [defendant] liable in the context of this case would defeat every legislative and judicial effort to assure that employers prohibit sexual discrimination in the workplace and have procedures in place to correct and prevent any violations of that policy."
The judge conceded that no New Jersey court had "expressly adopted" this defense in LAD actions, but she noted that the Appellate Division had "favorably cited this principle in support of the concept *463 that the employer should not be penalized for having procedures in place, yet the employee fails to take advantage of the preventive or corrective opportunities," (citing Heitzman, supra, 321 N.J.Super. at 145 n. 3, 728 A.2d 297). In that footnote the Heitzman court observed that the two United States Supreme Court cases, cited above, had held that an employer's vicarious liability under Title VII was governed by section 219(2) of the Restatement. But, the court added that the Supreme Court had ruled that an employer could defeat such liability by showing that it exercised reasonable care to avoid and correct any harassing behavior, and that the plaintiff-employee unreasonably failed to take advantage of the employer's opportunities to ameliorate any harm. Heitzman, supra, 321 N.J.Super. at 145 n. 3, 728 A.2d 297.
Plaintiff correctly observes that "the reference in Heitzman is but dicta in a footnote" and that the "Faragher/Ellerth" defense had "not been applied elsewhere in New Jersey." However, in Cavuoti, supra, 161 N.J. at 117 n. 1, 735 A.2d 548, the Court quoted without comment the Heitzman footnote. In Mancuso v. City of Atlantic City, 193 F.Supp.2d 789, 798-99 n. 7 (D.N.J.2002), New Jersey's federal district court recognized that the Ellerth/Faragher defense had never been applied to an LAD claim. The court declined to predict how our Supreme Court would answer this "difficult issue," because the plaintiff had raised genuine issues of material fact on the vicarious liability issue. Id. at 799.
There is no barrier to the application of a Title VII defense to an LAD action. Indeed, to the contrary, as the Court stated in Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990):
In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority. The substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience. In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII of the Civil Rights Act of 1964.
However, the Ellerth/Faragher defense, according to the Court that conceived it, is not "available ... when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Ellerth, supra, 524 U.S. at 765, 118 S.Ct. at 2270, 141 L.Ed.2d at 655; Faragher, supra, 524 U.S. at 808, 118 S.Ct. at 2293, 141 L.Ed.2d at 689. (emphasis supplied). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, supra, 524 U.S. at 761, 118 S.Ct. at 2268, 141 L.Ed.2d at 652-53.
The reason for barring the defense when there is a "tangible employment action" is that in such a case it is clear that the agency relation aided in the harassment, within the meaning of section 219(2)(d) of the Restatement. The Court in Ellerth explained:
Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and *464 may be subject to review by higher level supervisors....
For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate....
Whether the agency relation aids in commission of supervisor harassment which does not culminate in a tangible employment action is less obvious.
[524 U.S. at 762-63, 118 S.Ct. at 2269, 141 L.Ed.2d at 653-54.]
The federal circuits are, however, split as to whether a "constructive discharge" which is the adverse action claimed by this plaintiffqualifies as a "tangible employment action" that precludes the Ellerth/Faragher defense. Compare Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 294-95 (2d Cir.1999) (ruling that a "constructive discharge" is not a "tangible employment action" because it "is not ratified or approved by the employer"), cert. denied, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000), with Jackson v. Ark. Dept. of Educ., Voc. & Tech. Educ. Div., 272 F.3d 1020, 1026 (8th Cir.2001) (ruling, without discussion, that a constructive discharge is a "tangible employment action"), cert. denied, 536 U.S. 908, 122 S.Ct. 2366, 153 L.Ed.2d 186 (2002).
An exhaustive analysis of the issue was undertaken by Chief Judge Bennett in Cherry v. Menard, Inc., 101 F.Supp.2d 1160 (N.D.Iowa 2000). There, the court identified three arguments put forward by Caridad to support its conclusion, and, persuasively in our view, demonstrated the flaw in each. First, Caridad pointed to the language in Ellerth that a "tangible employment decision requires an official act of the enterprise, a company act," and that:
When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
[524 U.S. at 762-63, 118 S.Ct. at 2269, 141 L.Ed.2d at 653 (citations omitted).]
Thus, Caridad reasoned, since "[c]o-workers, as well as supervisors, can cause the constructive discharge of an employee," a constructive discharge cannot constitute a tangible employment action. Caridad, supra, 191 F.3d at 294. The Cherry court offered two responses to this argument. First, since whether a constructive discharge constitutes a tangible employment action would, under Ellerth, arise only if the actor who caused the constructive discharge was a supervisor, "co-worker conduct is simply irrelevant." Cherry, supra, 101 F.Supp.2d at 1171. Second, the court opined that Caridad had erroneously failed to focus on the quoted Ellerth language that a tangible employment action is *465 one that "inflicts direct economic harm." Thus, when a constructive discharge resulting from the actions of a supervisor leads to "direct economic harm" it constitutes a "tangible employment action," id. at 1172-73, as much as any firing. "[A] constructive discharge that results from the sexually harassing conduct of a supervisor should suffice to deprive an employer of the Ellerth/Faragher affirmative defense." Id. at 1173.
The second reason advanced by the Caridad court is that "unlike demotions, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer." Caridad, supra, 191 F.3d at 294. Cherry persuasively answered that rationale as follows:
However, a "constructive discharge" that results from the sexually harassing conduct of a supervisor is no less the "act of the employer" than a firing, failure to promote, demotion, or reassignment. This is so, because, by definition, "`[a] constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable with the intent of forcing the employee to leave the employment.'" To show the employer's intent to force the employee to quit, "the employee's resignation must be a reasonably foreseeable consequence of the employer's discriminatory action." Actions of a supervisor may satisfy these requirements.
[Cherry, supra, 101 F.Supp.2d at 1173-74 (citations omitted).]
Thus, Caridad "overlooks the fact that a constructive discharge resulting from a supervisor's conduct is, legally, the employer's own `deliberate act.'" Id. at 1174 (citations omitted).
Finally Caridad asserted that the Supreme Court in Ellerth had itself "indicated" that a constructive discharge did not constitute a tangible employment action. It drew this conclusion from the fact that in remanding the case the Supreme Court observed that "`Ellerth has not alleged she suffered a tangible employment action at the hands of [her supervisor].'" Caridad, supra, 191 F.3d at 295 (quoting Ellerth, supra, 524 U.S. at 766, 118 S.Ct. at 2271, 141 L.Ed.2d at 655). However, as Cherry noted, whatever the Court may have intended by that comment, whether a constructive discharge constitutes a tangible employment action was not at issue in Ellerth, just as it had not been at issue when the case was before the Seventh Circuit. Cherry, supra, 101 F.Supp.2d at 1174-75. It can rightly be said that the Supreme Court left that issue "entirely open." Id. at 1175.
In Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-54 (3rd Cir.1999), the Third Circuit suggested that a constructive discharge would be a tangible employment action. However, the court did not have to deal with the issue directly since it found that several actions taken by the employer before the employee quit were themselves sufficient to constitute tangible employment actions. "If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." Id. at 153 (citation omitted). As a result, in Cardenas v. Massey, 269 F.3d 251, 261 n. 10 (3rd. Cir.2001), the court considered the issue to be still unresolved in the Third Circuit, leaving it to be resolved on remand by the District Court in the first instance. The court assumed, for purposes of its discussion, that "a constructive discharge is tangible employment action." Ibid. Proceeding from that assumption the court found that plaintiff had presented sufficient facts to survive summary judgment on the question of whether he had been constructively discharged by virtue of a hostile work environment. Id. at 266-67.
*466 In a recent case, our Supreme Court stated, without analysis or mention of Ellerth and Faragher, that "[a] defendant is entitled to assert the existence of an effective anti-sexual harassment workplace policy as an affirmative defense to vicarious liability." Gaines v. Bellino, supra, 173 N.J. at 320, 801 A.2d 322. Apparently the plaintiff in that case continued working for the employer; thus, there was no issue concerning whether there had been a "tangible employment action" within the meaning of the Ellerth/Faragher defense. In fact, the employer took disciplinary action against the offending supervisor. The issues were whether the employer's actions relieved it from liability under either section 219(2)(b) or (d) of the Restatement. The Court reversed summary judgment on both grounds, holding that there were disputed fact questions that the trial court should not have resolved. Thus, Gaines did not provide an answer, explicit or implicit, to the issue we now confront.
We find ourselves in agreement with the Cherry court's conclusion that "a constructive discharge resulting from sexually harassing conduct of a supervisor does constitute a `tangible employment action' within the meaning of the Ellerth/Faragher standard, and therefore would deprive an employer of the Ellerth/Faragher defense to vicarious liability." Cherry, supra, 101 F.Supp.2d at 1175. Various federal District Court cases taking the Caridad position are, in our view, unpersuasive for the reasons discussed at length in Cherry. Id. at 1175-76. As Cherry concluded, "it would create a strange incentive, indeed, if an employer could ensure the availability of the affirmative defense by forcing an employee to quit by making the employee's workplace intolerable." Id. at 1176-77.
Of course, plaintiff must first establish that defendant is vicariously liable under the Lehmann standards. The motion judge ruled that defendant was entitled to summary judgment on that point, concluding, in effect, that plaintiff had not adduced enough evidence to raise fact questions. We disagree with that conclusion, finding that plaintiff did present sufficient evidence to withstand summary judgment.
Whether an employer was vicariously liable under section 219(2)(d) of the Restatement is usually a question of fact for the jury. Mancuso, supra, 193 F.Supp.2d at 799; Newsome v. Administrative Office of the Courts, 103 F.Supp.2d 807, 822 (D.N.J.2000), aff'd, 51 Fed.Appx. 76 (3rd Cir.2002); Shepherd v. Hunterdon Dev. Ctr., supra, 336 N.J.Super. at 423, 765 A.2d 217. For example, in Shepherd, we reversed a summary judgment in favor of an employer when the plaintiff-employee had raised disputed fact questions as to the extent to which the harassing supervisors were aided by authority delegated to them by the employer.
Viewing the record as a whole and in the light most favorable to plaintiff, we conclude that disputed fact questions were present as to the four elements of the Lehmann analysis: 1) delegation of authority to the supervisor; 2) exercise of that authority; 3) resulting creation of a hostile environment; and 4) aided-by-agency (the hostile environment was aided by the employer's delegation of authority). Lehmann, supra, 132 N.J. at 620, 626 A.2d 445.
Regarding the first element, the record established that defendant delegated to Molinet the oversight of the SAP project. The extent of Molinet's authority over plaintiff was disputed, but, as we concluded above, at the summary judgment stage there was enough evidence to support the inference that Molinet, at least in plaintiff's eyes, had the authority of a supervisor.
*467 Second, plaintiff also established at least a question of fact as to whether Molinet exercised his supervisory authority in exerting his undue control over plaintiff. Third, there was ample evidence that Molinet used his supervisory power to create the hostile work environment. Finally, had Molinet not been granted supervisory status over plaintiff, he could not have harassed her; hence, he was aided by his agency relationship.
In sum, the judge erred in granting summary judgment on the theory of vicarious liability.
At the trial on remand, plaintiff first must prove that Molinet was her "supervisor," as discussed above. Then she must prove that defendant was vicariously liable for Molinet's harassment. As we have held, if plaintiff was constructively discharged based upon Molinet's actions for which defendant was responsible, the Ellerth/Faragher is not available and defendant would be liable.
The judgment is reversed and the matter remanded for trial.
NOTES
[1] The facts are drawn from defendant's "STATEMENT OF UNDISPUTED MATERIAL FACTS," which it submitted to the trial court under R. 4:46-2. Most of the facts were admitted by plaintiff in her "RESPONDING STATEMENT." We will indicate those allegations that she denied.
[2] The United States Supreme Court has ruled that a supervisor who sexually harasses an employee acts outside the scope of employment, within the meaning of section 219 of the Restatement. Ellerth, supra, 524 U.S. at 757, 118 S.Ct. at 2267, 141 L.Ed.2d at 650; Faragher, supra, 524 U.S. at 794, 118 S.Ct. at 2286, 141 L.Ed.2d at 680.
[3] In fact, neither Molinet nor anyone else did such a review.