656 S.E.2d 33

**COLGAN AIR, INC., Appellant,**

v.

**WEST VIRGINIA HUMAN RIGHTS COMMISSION and Rao Zahid Khan, Appellees.**

**No. 33355.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2007.

Decided Oct. 25, 2007.

Concurring in part and dissenting in part Opinion of Justice Albright November 21, 2007.

Concurring in part and dissenting in part Opinion of Justice Starcher December 6, 2007.

Brian J. Moore, Jackson Kelly P.L.L.C., Charleston, WV, Mark A. Dombroff, Shaleeza Altaf, McLean, VA, Attorneys for Appellant, Colgan Air, Inc.

Darrell V. McGraw, Jr., Attorney General, Paul R. Sheridan, Deputy Attorney General, Attorneys for Appellee, West Virginia Human Rights Commission.

Dwight J. Staples, Henderson, Henderson & Staples, L.C., Huntington, WV, Attorneys for Appellee, Rao Zahid Khan.

PER CURIAM.

The appellant, Colgan Air, Inc. (hereinafter "Colgan"), appeals from an adverse ruling issued by the West Virginia Human Rights Commission (hereinafter "HRC") on December 22, 2006. Such order reversed the February 22, 2006, order of the administrative law judge (hereinafter "ALJ"). The order appealed from found Colgan liable to Rao Zahid Khan (hereinafter "Mr. Khan") for harassment and discrimination, and further

found that Mr. Khan's subsequent discharge and failure to retrain was in retaliation for his earlier complaints of discrimination. On appeal to this Court, Colgan argues that such order was in error and lacked support, and that the order by the ALJ, which found no discrimination, had substantial support and should have been affirmed by the HRC. Based upon the parties' arguments,[1] the record designated for our consideration, and the pertinent authorities, we reverse the order of the HRC. In so doing, we find that the HRC erred in holding the employer, Colgan, liable for damages to Mr. Khan for harassment and discrimination.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Mr. Khan began work with Colgan in August 2000 as a pilot trainee. He successfully completed his initial proficiency check on September 21, 2000, and his initial operating experience on September 30, 2000, as a First Officer. Mr. Khan went on the flight line in October 2000, with the hopes of becoming a Captain.

During his employment with Colgan, Mr. Khan was subjected to inappropriate treatment by some of his coworkers. Specifically, fellow employees Captain Riley, Captain Galbrath,[2] and Captain Heuston repeatedly referenced Mr. Khan's race, religion, and intelligence.[3] Mr. Khan was the victim of labels such as "sand n* * * *r," "rag head," and "camel jockey." He was also subjected to repeated comments about being a terrorist. These fellow employees evidenced a general dislike of Mr. Khan, and displayed their feelings through inappropriate remarks about Mr. Khan's wife, his flying skills, and by threatening that they would do everything in their power to get him fired, including making him fail his proficiency test.

Mr. Khan and another coworker complained about the treatment of Mr. Khan. The complaints were made to Captain Mayers, who was the Lead Pilot[4] for Colgan at the Huntington, West Virginia, crew base. Most members of the crew knew of the treatment to which Mr. Khan had been subjected. Captain Mayers admits to knowledge of the behavior by Captains Riley and Heuston, and that each time he learned of inappropriate treatment towards Mr. Khan, he would tell Captains Riley and Heuston to "knock it off" as he deemed their behavior dishonorable and unprofessional. Captain Mayers *did not* notify anyone at headquarters in Manassas, Virginia, regarding the conduct.

In June 2001, Captain Riley made offensive comments to Mr. Khan about Mr. Khan's wife. Mr. Khan was so upset that he traveled to headquarters in Manassas, Virginia, to talk to someone about the harassment. In Manassas, Mr. Khan spoke to Ms. Finnigan, Vice President for Personnel and Marketing, about the treatment he received from Captain Riley. Ms. Finnigan then spoke to Captain Riley on June 20, 2001, in Manassas, Virginia, regarding Mr. Khan's complaints of discriminatory comments. Captain Riley denied making any discriminatory comments. Ms. Finnigan proceeded to retrain Mr. Riley with respect to the sexual harassment and discrimination policy. The Chief Pilot, also at Manassas, Virginia, talked to Captain Riley about what is considered professional behavior and wrote a letter of reprimand dated June 20, 2001. Captain Riley was told that if any other incidents occurred, he would be severely disciplined, including possible termination. Ms. Finnigan then contacted Captain Mayers, Lead Pilot, in Huntington, West Virginia, regarding the allegations. Captain Mayers admitted that he knew of the person-

---

1. We wish to acknowledge the contribution of an amicus curiae brief filed in this case. We value the participation and will consider the brief in conjunction with the parties' arguments.

2. While some facts existed through second-hand knowledge of comments made by Captain Galbrath, the facts relevant to this case are mostly regarding Captains Riley and Heuston.

3. Mr. Khan is of Pakistani national origin and Asian race, and his religion is Muslim.

4. The position of Lead Pilot is an administrative position acting as a liaison between the flight crews stationed at the base and the Chief Pilot. The Chief Pilot is the supervisor over the pilots, but is stationed at Colgan's headquarters in Manassas, Virginia.

ality conflicts, but stated that he was not aware it was due to "race, religion or any kind of harassment or discrimination issue."

Thereafter, on July 9, 2001, a hand-drawn cartoon was posted that was highly offensive. The cartoon depicted an airline with the caption "COLGAN AIR NOW HIRING PUNJAB PILOTS!!!" Further, it stated, "NOTE: PUNJAB AIRLINES NOT RESPONSIBLE FOR LOSS OF LIFE HUMAN ANIMAL OR OTHERWISE[.]" A coworker of Mr. Khan's faxed the cartoon to the Chief Pilot in Manassas, Virginia, who alerted Ms. Finnigan. Upon inquiry, it was learned that the cartoon was drawn at Captain Riley's crash pad by his roommate, Captain Heuston. Ms. Finnigan contacted Mr. Khan, who informed her that Captain Riley made a death threat against him and his wife, and that he filed a criminal report. Captain Riley was suspended on July 9, 2001.

A meeting was scheduled for Captain Heuston to meet with Ms. Finnigan and the Chief Pilot in Manassas, Virginia. However, prior to the time of the meeting, Captain Heuston faxed in a letter of resignation and did not report for the meeting. Captain Riley was scheduled to appear for a meeting on July 11, 2001. However, instead of reporting for the meeting, Captain Riley telephoned from his attorney's office. During the phone call, Ms. Finnigan terminated Captain Riley; wherein, Captain Riley tendered his forced resignation. After the resignations of Captains Riley and Heuston, Mr. Khan was no longer the subject of any other improper conduct from his coworkers.

Mr. Khan was the only one from his training class who had not been upgraded from First Officer to Captain. On October 30, 2001, Mr. Khan underwent a mandated FAA proficiency check. Mr. Khan satisfactorily passed the oral portion of the exam, but failed the flying portion. During the proficiency check, Mr. Khan failed to complete a

takeoff stall, an FAA required maneuver. His attempt at this tactic resulted in a loss of an unacceptable amount of altitude during the maneuver.[5] The check airman for the proficiency check alerted Mr. Khan to his failure, suspended the testing portion of the flight, and retrained Mr. Khan. Mr. Khan then successfully re-attempted the maneuver. Mr. Khan was then directed to perform an ILS approach, which is another FAA mandated tactic. Mr. Khan also failed this part of the proficiency check when he deviated from the center lines of the localizer and glide slope and exceeded permitted descent speed, resulting in an unstable approach. The check airman again alerted Mr. Khan of his failed maneuver, suspended the testing portion of the flight, and provided retraining. Mr. Khan's second attempt at the ILS approach was successful. As the next part of the proficiency check, Mr. Khan was directed to complete a VOR approach, which is another FAA required maneuver. Mr. Khan failed this attempt because he was late configuring the aircraft in terms of landing gear and reduction of power. Mr. Khan's actions placed the aircraft in a dive and caused the Ground Proximity Warning System to activate. The check airman was forced to take control of the aircraft to prevent a crash. FAA guidelines allow a maximum retraining on two maneuvers during a proficiency check. Because Mr. Khan had already received retraining on both the takeoff stall and the ILS approach, a third retraining was not allowed. Thus, the third failed maneuver resulted in a failed proficiency check under FAA guidelines.[6]

The facts elicited during the ALJ hearing portrayed a pilot who was unsafe. While it was acknowledged that Mr. Khan's skills did progress, he needed a lot of instruction while flying. The Lead Pilot, Captain Mayers, stated that he doubted Mr. Khan was capable of commanding an airplane. As support for

5. The allowable altitude loss is set by FAA guidelines.

6. Mr. Khan's application to Colgan's training program illustrates that Mr. Khan had held one previous pilot position with American Eagle Airlines, from April to June 2000. He was involuntarily terminated from that position during

training due to deficiencies in his flight skills, including difficulty with approaches and landings. Information provided by his previous employer also illustrated that Mr. Khan had failed to complete an initial upgrade or transition training course. Additionally, he had failed a required proficiency check.

this feeling, it was recounted that, on one occasion, Mr. Khan lined up on the wrong runway, and another pilot had to take control of the plane.

After Mr. Khan's failed proficiency test, he was informed that Colgan did not have the funds to retrain him. From September through December 2001, Colgan was unable to provide retraining to anyone. Thirty pilots were furloughed and others downgraded to First Officer on September 20, 2001, due to financial constraints. Moreover, three leased planes were returned. After the terrorist attacks on September 11, 2001, most airlines, including Colgan, experienced financial difficulties. Colgan was also in the midst of a bankruptcy consultation at the time in question. Thus, without the possibility of retraining, Mr. Khan had the option to resign or to be terminated. Mr. Khan chose to resign.

Thereafter, Mr. Khan filed a discrimination action against Colgan with the HRC in April 2002. The proceedings were held in March 2005, wherein Mr. Khan alleged he had been subjected to a hostile work environment due to his race, religion, ancestry, and sex. He further averred that the offensive conduct was perpetrated by his supervisors and that Colgan failed to address the situation. The ALJ found, by order entered February 22, 2006, that "[Mr. Khan] was subjected to unwelcome conduct based upon his membership in these various protected classes; particularly his Muslim faith and Pakistani national origin. The unwelcome conduct was both severe and pervasive in its nature. That conduct included offensive comments concerning his national origin, his ancestry, his color and race." The ALJ further found that "[t]he harassment of [Mr. Khan] and the hostile and abusive workplace created at [Colgan's] Huntington crew base (and in the cockpit when flying with Caption Riley), were created by non[-]management employee[.]" Moreover, the ALJ found:

> Captain Mayers, as Lead Pilot at [Colgan's] Huntington crew base, had no actual authority to take any disciplinary actions against Captain Riley (or Captains Heuston or Galbrath) because he had no management or supervisory authority.

[Colgan] had a procedure for reporting harassment which included reporting it to the Chief Pilot or the Vice President for Personnel. The harassment policy of [Colgan] makes it incumbent upon any employee to report discrimination and to investigate it should it occur.

Furthermore, the record makes clear that Colgan employees must undergo Discrimination and Harassment Training. On August 7, 2000, Mr. Khan signed an acknowledgment certifying that he had reviewed and understood the anti-harassment policy and received the training, which stated:

> If anyone believes they are being subjected to any of these forms of harassment, or believes they are being discriminated against because other employees are receiving favored treatment in exchange, for example, for sexual favors, we must bring this to the attention of appropriate persons in management. The very nature of harassment makes it virtually impossible to detect unless the person being harassed registers his or her discontent with Colgan Air Management. Consequently, in order for Colgan Air to deal with the problem, we must report such offensive conduct or situations to the Immediate Supervisor, or the Director of Personnel[.] ... If you are unsatisfied with the attention your report receives, contact Mary Finnigan, Vice President, Marketing and Personnel[.]

The ALJ went on to find that management did not know of the harassing situation until Mr. Khan went to Manassas, Virginia, to speak to Ms. Finnigan following the comments about his wife. Thereafter, Colgan took appropriate and decisive action.

In regard to Mr. Khan's claim that the failure to promote him to Captain was a result of disparate and retaliatory treatment, the ALJ concluded as follows:

> [Mr. Khan] has established a prima facie case of both hostile workplace discrimination and discrimination in the failure to promote him to Captain on the basis of race, national origin, religion and gender and retaliation; and retaliation for complaining of discrimination in the failure to promote him to Captain and subsequent termination after failing his FAA proficien-

cy check ride. [Colgan] claims that the discriminatory hostile work environment is not imputable to the employer because it was created by [Mr. Khan's] coworkers and not his supervisors; and, that [Colgan] took immediate and effective action to correct the situation once the appropriate corporate officials were made aware of the situation. [Colgan] articulated legitimate non discriminatory reasons for its failure to upgrade [Mr. Khan] to Captain and his forced resignation following an FAA proficiency check ride. Those reasons being his poor pilot skills and his failing three required maneuvers during the FAA proficiency check ride. [Mr. Khan] has not proven by a preponderance of the evidence that race, national origin, religion or gender discrimination motivated or played a role in the decision not to upgrade [Mr. Khan] to Captain or the decision to terminate his employment; or, that his termination was the result of retaliation for his complaints about discrimination. The undersigned finds that [Mr. Khan] has not proven by a preponderance of the evidence that the hostile work environment is imputable to [Colgan] because [Colgan] took reasonable steps to investigate and eliminate the harassment of [Mr. Khan] once it became aware of the situation.

Subsequently, Mr. Khan appealed this adverse decision by the ALJ to the full HRC. The HRC reversed the ALJ and found Colgan to be liable to Mr. Khan for workplace discrimination. In so doing, the HRC found as follows:

The findings of fact of the [ALJ], in this case, reveal that [Mr. Khan] faced egregious harassment because of his religion, ethnicity and national origin at [Colgan's] facility at the Tri–State[ ] Airport in Huntington, West Virginia. [Colgan's] management officials at the Tri–State[ ] Airport failed to address this harassment at the Tri–State Airport until compelled to do so by [Colgan's] corporate management located at Manassas, Virginia. . . . To [Colgan's] credit, once the report of harassment was made to [Colgan's] management officials in Manassas, [Colgan] did act to stop the harassment. . . . Accordingly, the Commission modifies the [ALJ's] decision to find

that [Colgan] is liable in damages to [Mr. Khan] for $5,000.00 (sum certain) for the harassment suffered by [Mr. Khan] and in addition for the expenses he incurred in traveling to Manassas, Virginia[,] to report the harassment to [Colgan's] corporate officials—something that should have been the responsibility (at the very least), of [Colgan's] local management officials at the Tri–State Airport. The Commission also finds that [Colgan] is liable for [Mr. Khan's] attorney fees and costs associated with this case in the sum of $46,575.00 . . . . [t]he Commission finds that not offering retraining to [Mr. Khan] was, in fact, discrimination, and finds that [Mr. Khan] should be reinstated to the next available non-flying position with retroactive seniority and benefits along with the opportunity to retrain.

Colgan appealed the HRC's rulings directly to this Court.

## II.

### STANDARD OF REVIEW

 The appeal before this Court results from the HRC's ruling that Colgan engaged in unlawful discriminatory practices. The parties appealed directly to this Court pursuant to W. Va.Code § 5–11–11 (1989) (Repl.Vol.2006). We have previously explained the standard of review as follows:

Where an appeal from an order issued by the West Virginia Human Rights Commission is brought directly to the West Virginia Supreme Court of Appeals, pursuant to W. Va.Code § 5–11–11 (1989), this Court will apply the same standard of review that is applied to Human Rights Commission orders appealed to a circuit court.

Syl. pt. 1, *Cobb v. West Virginia Human Rights Comm'n,* 217 W.Va. 761, 619 S.E.2d 274 (2005). In reviewing cases appealed to a circuit court from the Human Rights Commission, we have held that

"West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchal-

lenged by the parties." Syllabus Point 1, *West Virginia Human Rights Comm'n v. United Transp. Union,* Local No. 655, 167 W.Va. 282, 280 S.E.2d 653 (1981). Syl. pt. 2, *Smith v. West Virginia Human Rights Comm'n,* 216 W.Va. 2, 602 S.E.2d 445 (2004). Further,

> "[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syllabus Point 1, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996).

Syl. pt. 1, *Smith,* 216 W.Va. 2, 602 S.E.2d 445. Thus, we apply a *de novo* standard of review to questions of law, and we will not disturb the findings of fact unless they are clearly wrong. Mindful of these applicable standards, we proceed to consider the parties' arguments.

## III.

## DISCUSSION

Both the ALJ and the HRC determined that Mr. Khan was the victim of unlawful discriminatory conduct at the hands of some of his coworkers, and that it was severe and pervasive. However, the ALJ and the HRC disagree as to when Mr. Khan gave sufficient notice to management of his coworkers' behavior to trigger Colgan's duty to take prompt remedial action. Further, the ALJ and the HRC agree that the failure to upgrade Mr. Khan from a First Officer to a Captain was a discriminatory action. However, the ALJ and the HRC disagree as to whether a legitimate, nonpretextual reason was offered by Colgan.

Thus, to resolve this appeal, we must address two issues. First, we must address whether Colgan is liable to Mr. Khan for harassment based upon a determination as to when management knew of the unlawful discriminatory conduct of Mr. Khan's coworkers. Second, we will determine if Colgan discriminated against Mr. Khan when it dis-

charged him and when it did not offer to retrain him with regard to his failed proficiency test, and if so, whether a legitimate nonpretextual reason was offered. These intertwined issues will be discussed together.

Under W. Va.Code § 5–11–9 (1998) (Repl. Vol.2006),

> [i]t shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:
>
> (1) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required[.]

Further, "[t]he term 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, disability or familial status and includes to separate or segregate[.]" W. Va.Code § 5–11–3(h) (1998) (Repl.Vol.2006).

As previously stated, because it is uncontroverted that Mr. Khan was the victim of unlawful discriminatory practices by his coworkers, the focus of our investigation must delve into when management knew of this behavior and whether appropriate action was taken. We have previously explained as follows:

> When the source of the harassment is a person's co-workers and does not include management personnel, the employer's liability is determined by its knowledge of the offending conduct, the effectiveness of its remedial procedures, and the adequacy of its response. Thus, an employer that has established clear rules forbidding sexual harassment and has provided an effective mechanism for receiving, investigating, and resolving complaints of harassment may not be liable in a case of co-worker harassment where the employer had neither knowledge of the misconduct nor reason to know of it.

*Hanlon v. Chambers,* 195 W.Va. 99, 108, 464 S.E.2d 741, 750 (1995) (footnote omitted). Simply, "the employer cannot be charged with responsibility for the victim's failure to complain." *Hanlon, id.* (footnote omitted). Once an employer knows of the unlawful conduct executed by a victim's coworkers, this Court has directed that

> [t]he aggravated nature of discriminatory conduct, together with its frequency and severity, are factors to be considered in assessing the efficacy of an employer's response to such conduct. Instances of aggravated discriminatory conduct in the workplace, where words or actions on their face clearly denigrate another human being on the basis of race, ancestry, gender, or other unlawful classification, and which are clearly unacceptable in a civilized society, are unlawful under the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –20 (1999), and in violation of the public policy of this State. When such instances of aggravated discriminatory conduct occur, the employer must take swift and decisive action to eliminate such conduct from the workplace.

Syl. pt. 3, *Fairmont Specialty Servs. v. West Virginia Human Rights Comm'n,* 206 W.Va. 86, 522 S.E.2d 180 (1999).

Applying these principles to the facts presently before this Court, it is clear that Colgan had a policy in place for reporting harassment and discrimination, and further, that Colgan took appropriate and decisive action as soon as the policy was followed and management was informed of the discriminatory conduct. The company policy, which Mr. Khan certified that he received and understood, directed that employees "must report such offensive conduct or situations to the Immediate Supervisor, or the Director of Personnel[.] ... If you are unsatisfied with the attention your report receives, contact, Mary Finnigan, Vice President, Marketing and Personnel[.]" While the Lead Pilot located in Huntington, West Virginia, was aware of the "personality conflicts" between Mr. Khan and some of his coworkers, the Lead Pilot is not the person to whom the reports must be made.

As found by the ALJ, "Captain Mayers, as Lead Pilot at [Colgan's] Huntington crew base, had no actual authority to take any disciplinary actions ... because he had no management or supervisory authority. [Colgan] had a procedure for reporting harassment which included reporting it to the Chief Pilot or the Vice President for Personnel." The relevant management positions are housed in Manassas, Virginia, at corporate headquarters. The Chief Pilot is Mr. Khan's immediate supervisor and is located in Manassas, Virginia. Significantly, Mr. Khan cannot claim ignorance in contacting authorities at headquarters as he did eventually make the appropriate contacts at headquarters to start the investigation into his complaints.

■ Moreover, once the appropriate channels were followed and management was alerted, Colgan took swift and decisive corrective action. Even the HRC recognized that "once the report of harassment was made to [Colgan's] management officials in Manassas, [Colgan] did act to stop the harassment[.]" Ms. Finnigan immediately conducted an investigation, resulting in harassment retraining, a letter of reprimand, and a warning of possible termination. When the violatory conduct did not cease, two employees were forced to resign their positions. Mr. Khan admits that the discriminatory conduct from coworkers ceased after the two perpetrators left employment. As soon as the appropriate management officials were notified of the unlawful discriminatory conduct, swift and decisive action was taken that ended the complained-of conduct. Thus, Colgan is not liable to Mr. Khan for harassment.

■ Even though we have determined that Colgan is not liable to Mr. Khan for harassment, our review does not end. We must next decide whether the failure to upgrade Mr. Khan to a Captain position was in retaliation for his reports of discrimination, and whether his subsequent forced resignation resulted from such retaliatory conduct. W. Va.Code § 5–11–9 dictates as follows:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where

based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

. . . .

(7) For any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to:

. . . .

(C) Engage in any form of reprisal or otherwise discriminate against any person because he or she has opposed any practices or acts forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

As we have previously stated, "W. Va.Code [§ ] 5–11–9(7)(C) (1992), prohibits an employer or other person from retaliating against any individual for expressing opposition to a practice that he or she reasonably and in good faith believes violates the provisions of the West Virginia Human Rights Act." Syl. pt. 11, *Hanlon*, 195 W.Va. 99, 464 S.E.2d 741. Moreover, this Court has instructed as follows:

> " 'In an action to redress an unlawful retaliatory discharge under the West Virginia Human Rights Act, *W. Va.Code*, 5–11–1, *et seq.*, as amended, the burden is upon the complainant to prove by a preponderance of the evidence (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation), (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation.' Syl. pt. 4, *Frank's Shoe Store v. West Virginia Human Rights Commission*, 179 W.Va. 53, 365 S.E.2d 251 (1986). Syl. pt. 1, *Brammer v. Human Rights Commission*, 183 W.Va. 108, 394 S.E.2d 340 (1990)." Syllabus Point 10, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995).

Syl. pt. 6, *Conrad v. ARA Szabo*, 198 W.Va. 362, 480 S.E.2d 801 (1996).

In light of the facts of the current situation, Mr. Khan has established a *prima facie* case of retaliatory discharge. Mr. Khan engaged in a protected activity when he complained of harassment and discrimination. It is also a foregone conclusion that Colgan was aware of the protected activity once Ms. Finnigan, located at company headquarters, became involved. The facts also show that Mr. Khan was discharged a short time after these events occurred. Thus, the inference has been raised, and the employer must overcome the inference of retaliatory discharge.

As this Court has previously recognized,

> "[w]hen an employee makes a prima facie case of discrimination, the burden then shifts to the employer to prove a legitimate, nonpretextual, and nonretaliatory reason for the discharge. In rebuttal, the employee can then offer evidence that the employer's proffered reason for the discharge is merely a pretext for the discriminatory act." Syllabus Point 2, *Powell v. Wyoming Cablevision, Inc.*, 184 W.Va. 700, 403 S.E.2d 717 (1991).

Syl. pt. 4, *Birthisel v. Tri–Cities Health Servs. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992). Colgan responded to the inference by averring that Mr. Khan was discharged due to his failure to pass a mandatory FAA proficiency test. The ALJ found that "[Colgan] articulated legitimate non discriminatory reasons for its failure to upgrade [Mr. Khan] to Captain and his forced resignation following an FAA proficiency check ride. Those reasons being his poor pilot skills and his failing three required maneuvers during the FAA proficiency check ride." Colgan has a duty under FAA guidelines to employ Captains who can safely and effectively navigate aeronautical procedures. The evidence is clear and insurmountable that Mr. Khan was unable to safely fly a plane, and that he failed a proficiency test that was previously scheduled according to the FAA mandates. Thus, his forced resignation was a result of his own inability to safely maneuver an airplane, and Colgan's failure to upgrade his ranking to Captain was in accordance with the prescribed federal procedure. While Mr.

Khan argues that his failure at the proficiency test was the result of sabotage, such a claim is not supported by the evidence. The FAA guidelines are very clear as to what aeronautical moves are required and to what degree of deviation results in an acceptable performance. There is no discretion as to whether a candidate passes or fails the test. Mr. Khan's performance was not within the acceptable parameters; thus, he failed the proficiency check. Significantly, the coworkers who had threatened to cause Mr. Khan to fail his proficiency test were no longer employed at Colgan at the time of Mr. Khan's proficiency flight. Thus, no adverse atmosphere was created by his coworkers.

The HRC's decision that the failure to retrain Mr. Khan was discrimination also is not supported by the facts. The facts illustrate that, due to financial constraints, no pilots were being offered retraining opportunities for a three-month period. Moreover, the degree of inability showed by Mr. Khan to conduct an airplane in a safe manner was egregious, and retraining would present safety issues. As has been previously stated, "'[t]he complainant [in a case arising under the West Virginia Human Rights Act] may prevail if it is shown the reason presented by the respondent is merely a pretext for a discriminatory motive.' Syl. pt. 3, *Mingo County Equal Opportunity Council v. State Human Rights Comm'n*, 180 W.Va. 240, 376 S.E.2d 134 (1988)." Syl. pt. 7, *Wheeling–Pittsburgh Steel Corp. v. Rowing*, 205 W.Va. 286, 517 S.E.2d 763 (1999). Colgan provided a nonpretextual reason for its decisions and was within its discretion to determine that retraining was not a possibility, especially given the additional fact that Mr. Khan had been terminated from his previous job for failure to pass a proficiency test. Thus, Colgan did not discriminate against Mr. Khan when he was not upgraded to Captain status, or when he was subsequently forced to resign after failing a proficiency test.

## IV.

### CONCLUSION

For the foregoing reasons, the HRC's order of December 22, 2006, is reversed.

Reversed.

Justices STARCHER and ALBRIGHT concur in part, and dissent in part, and reserve the right to file separate opinions.

ALBRIGHT, Justice, concurring, in part, and dissenting, in part.

(Filed November 21, 2007)

I agree with the majority that Mr. Khan should not be reinstated to a pilot position based upon his performance on the flight proficiency testing, governed by federal FAA standards. However, I respectfully dissent from the majority's holding that Mr. Khan is not entitled to any remedy for the harassment he endured.

The majority premises its holding upon its judgment that knowledge of the harassment was not attributable to management. The procedure established by Colgan Air for the reporting of harassment, reviewed by Mr. Khan when he received training, instructed that an employee should report offensive conduct to the immediate supervisor or the director of personnel. Colgan Air maintains that Mr. Khan's immediate supervisor was Chief Pilot Mike Kelly, located in the Manassas, Virginia, office. However, in responding to the harassment against him, Mr. Khan reported to Captain Mayers, the Lead Pilot for Colgan Air situated in Huntington with Mr. Khan. As the majority recognizes, the Lead Pilot occupies an administrative position as liaison between the Huntington flight crews and the Chief Pilot stationed at Colgan's headquarters in Manassas, Virginia. Colgan Air ultimately contends that Mr. Khan failed to give sufficient notice of the harassment since he did not inform the proper person that the offensive behavior was occurring.

Consequently, the question for this Court is whether Mr. Khan unreasonably failed to avail himself of the employer's established procedures for reporting and correcting harassing behavior and in so doing denied himself the protections created thereby. I disagree with the majority's resolution of that issue and believe that knowledge of workplace harassment should have been held to be attributable to upper management under

the circumstances present in this case. The Human Rights Commission accurately made such a finding, and the majority was incorrect to disturb findings of fact that were not clearly wrong.

Mr. Khan was stationed at the Tri–State Airport in Huntington, West Virginia, and contends that he endured harassment from August 2000 to July 2001. He contends that he complained to Captain Mayers [1] about the harassment approximately twenty-five times. Although Captain Mayers maintains that he told Mr. Khan to contact the Chief Pilot, Mr. Khan states that Captain Mayers never informed him that he should refer the complaints to the Chief Pilot in Manassas and always led Mr. Khan to believe that the issue would be resolved. Furthermore, the testimony of Ms. Pam Jarrell revealed that she personally informed Mary Finnigan, Vice President of Personnel and Marketing in the Manassas office, of Mr. Khan's harassment as early as March or April 2001.

In *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995), this Court held as follows:

> Where an agent or supervisor of an employer has caused, contributed to, or acquiesced in the harassment, then such conduct is attributed to the employer, and it can be fairly said that the employer is strictly liable for the damages that result. When the source of the harassment is a person's co-workers and does not include management personnel, the employer's liability is determined by its knowledge of the offending conduct, the effectiveness of its remedial procedures, and the adequacy of its response.

195 W.Va. at 108, 464 S.E.2d at 750. Application of that standard to this situation requires a dual analysis: first, whether the offending individuals are agents or supervisors, and second, whether Mr. Khan notified his immediate supervisor and when management personnel learned of the harassment.

The record supports a conclusion that the harassing individuals can accurately be characterized as individuals who exercised supervisory control [2] over Mr. Khan, despite Colgan Air's contention that they are merely coworkers. That is, as *Hanlon* instructs, a distinction of significant import in the determination of employer liability. If the offending individuals are indeed supervisors, *Hanlon* makes it clear that there is liability imputed to the employer.

One federal court has observed that "[d]etermining whether an employee is a supervisor as opposed to a mere co-worker has been a tricky business for courts." *Schele v. Porter Mem. Hosp.,* 198 F.Supp.2d 979, 989 (N.D.Ind.2001). As explained by the New Jersey court in *Entrot v. BASF Corp.,* 359 N.J.Super. 162, 819 A.2d 447 (2003), "[t]he federal courts appear to have split into two camps, one focusing on power to make key personnel decisions and the other on power to direct on-the-job activities." 819 A.2d at 456. In *Entrot,* the court noted that "supervisory status depends on the nature of the employer's delegation of authority to the harassing co-worker. If the co-worker had the authority to control the work environment, any harassing behavior by him or her will cause the employer to be liable." 819 A.2d at 454.

As the New Jersey court explained in *Heitzman v. Monmouth County,* 321 N.J.Super. 133, 728 A.2d 297 (1999), "[a]n employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor 'to control the day-to-day working environment' facilitates the harassing conduct." 728 A.2d at 302, quoting *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 462 (1993).

---

1. Colgan Air maintains that Captain Mayers had no management authority or responsibility, despite the fact that he was the highest-ranking employee at the Huntington site.

2. Mr. Khan was employed as a first officer, and the offending individuals were all captains. Mr. Khan contends that these individuals exercised supervisory control over him to the extent that they could control his activity and their judgments concerning his performance could impact his employment. For instance, one of the captains, Terry Riley, had refused to pass Mr. Khan on a simulator training machine. Captain Jimmy Galbrath had caused a disciplinary notation to be placed in Mr. Khan's file regarding his landing approach.

In *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254 (M.D.Ala.2001), the Alabama court rejected a proposed requirement that an individual must have the power to hire, fire, or discipline in order to be characterized as a supervisor. 133 F.Supp.2d at 1266. Rather, the *Dinkins* court found that an individual may be deemed a supervisor if he is empowered "to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks." *Id.*

This approach has been adopted by the Equal Employment Opportunity Commission in its enforcement guidelines, wherein an individual qualifies as an employee's supervisor if "the individual has authority to undertake or recommend tangible employment decisions affecting the employee" or if "the individual has authority to direct the employee's daily work activities." EEOC, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, http://www.eeoc.gov/policy/docs/harassment.html (last modified June 21, 1999).

In *Browne v. Signal Mountain Nursery, L.P.*, 286 F.Supp.2d 904 (E.D.Tenn.2003), the United States District Court for the Eastern District of Tennessee addressed the definitional issue and reasoned as follows:

> [A]n employee does not qualify as a "supervisor" for purposes of Title VII employer vicarious liability unless he or she is placed by the employer, formally or informally, in a position of superior authority and possesses some significant degree of control over the hiring, firing, demotion, promotion, transfer, or discipline of subordinates. Supervisory status is not a formulaic question of title, but a particularized inquiry into the nature and extent of the authority bestowed upon an employee by an employer. The authority entrusted in a supervisory employee need not be

plenary or absolute, but it must encompass, in some significant way, the power to initiate, recommend, or effect tangible employment actions affecting the economic livelihood of the supervisor's subordinates. 286 F.Supp.2d at 918.

The United States District Court for the Eastern District of Texas, in *Hayes v. Laroy Thomas, Inc.*, 2007 WL 128287 (E.D.Tex. 2007), analyzed the reasoning of cases addressing this issue and ultimately adopted the *Browne* approach, defining supervisor broadly enough to encompass not only individuals with the power to hire and fire but also individuals with power to affect the economic livelihood of subordinates. Specifically, the *Hayes* court held:

> The Court, having reviewed the relevant case law and arguments of the parties, is of the opinion the most appropriate definition of "supervisor" is the one provided in summary by the court in *Browne.... This definition requires more than just* daily supervision of daily work activities and work assignments. However, it acknowledges that the authority entrusted to the supervisory employee need not be absolute; it can encompass the power to initiate, recommend, or effect tangible employment actions.

2007 WL 128287 at *16.[3]

In discussing the perils of the narrow definition of supervisor, a concurring opinion in *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498 (7th Cir.2004), explained as follows:

> Cases like this one suggest that we ought to re-examine the criteria we have articulated for identifying supervisors. The standard that this circuit has established has the allure of drawing a bright line between those who have the power to make formal employment decisions and those who do not. But it excludes from the category of supervisor those employees who, although lacking final authority to hire, fire, promote, demote, or transfer the plaintiff, nonetheless enjoy substantial authority over the plaintiff's day-to-day work

**3.** Courts evaluating the parameters of the definition of "supervisor," as used in the context of determining employer liability, have not been consistent. Some courts have adopted various

forms of narrower definitions. *See, e.g., Noviello v. City of Boston,* 398 F.3d 76, 95 (1st Cir.2005); *Joens v. John Morrell & Co.,* 354 F.3d 938, 940 (8th Cir.2004).

life. To that extent, it is a standard that arguably does not comport with the realities of the workplace. And to the extent that employers with multiple worksites vest the managers of such sites with substantial authority and discretion to run them but reserve formal employment authority to a few individuals at central headquarters, *our standard may have the practical, if unintended, effect of insulating employers from liability for harassment perpetrated by their managers.*

359 F.3d at 510 (Rovner, Judge, concurring) (emphasis provided).

In the case sub judice, the majority of this Court resolved *both* components of this question in favor of Colgan Air, finding that the offending individuals were not acting in a supervisory role *and* that Mr. Khan did not report to the proper "immediate supervisor," since Mr. Khan reported only to Captain Mayers rather than to management personnel in Manassas, Virginia. Captain Mayers was the Lead Pilot in Huntington, he was apprised of this harassment repeatedly, and he assured Mr. Khan that the matter would be dealt with. To hold that Mr. Khan failed to adequately report the harassment under these circumstances is a disingenuous exercise in semantics. Further, by failing to acknowledge that the offending personnel were acting in a supervisory role, this Court's conclusions have perpetuated, as Judge Rovner observed above, the "practical, if unintended, effect of insulating employers from liability for harassment perpetrated by their managers." *Rhodes*, 359 F.3d at 510 (Rovner, Judge, concurring).

STARCHER, J., concurring, in part, and dissenting, in part.

(Filed December 6, 2007)

I write separately to join Justice Albright's separate opinion. While the record supports Mr. Khan losing his pilot's license, I believe that the record supports that Mr. Khan should be afforded some remedy for the horrific abuse to which he was subjected in the course of his employment. Mr. Khan repeatedly reported the abuse to his supervisor, Captain Mayers, the lead pilot situated in Huntington with Mr. Khan. When he re-ceived no relief, Mr. Khan then reported the abuse to Chief Pilot Mike Kelly, located in the Manassas, Virginia office. Only then did Colgan Air take actions designed to terminate the abuse.

I also write separately to discuss my actions during the oral argument of this case.

Courts of appeal do not take evidence, and do not see and hear witnesses testify. Courts of appeal operate on the sterile paper record that was created in a court below—in this case, the West Virginia Human Rights Commission. Courts of appeal are supposed to be guided by pure reason and fairness, interpreting the law and applying it to facts printed in the lower-court record..

This Court is, then, supposed to be swayed by logic, reason, and justice, not passionate appeals to our inner instincts, wishes and beliefs. The final rulings of this Court, in each case, are printed and enshrined in official reporters that will line the walls of law offices for years to come; accordingly, the Court's reasoning must not only fairly apply to the case currently before the Court, but must apply fairly to cases not yet envisaged in the decades and centuries to come.

But, time and again, lawyers appear before this Court and act as though they are presenting arguments to a jury. They raise their voices, pound the podium, wave documents in the air, and engage in all sorts of histrionics. These lawyers also engage in subtler appeals to bias. Lawyers often bring their clients into the courtroom and implicitly dare the Court to apply reason and logic in a way that is detrimental to their client's case. These lawyers often forget they are talking, not to a jury, but to five judges who were once themselves lawyers who engaged in histrionics before juries. And the members of the Court are—theoretically—looking for clarification and understanding of the tepid legal issues contained by a case.

This case presented, in my view, just such histrionics. This case was argued at Marshall University, before a large crowd composed mostly of college students interested in seeing how the third branch of government conducts business. Counsel for the appellant, Mark Dombroff, stridently argued to the Court in a finger-pointing, "I dare you to rule this way" presentation to the Court.

Mr. Dombroff also brought with him his firm's[1] junior associate, Shaleeza Altaf. A young attorney, Ms. Altaf is—like Mr. Khan—of Pakistani descent. In my many years as a circuit and appellate judge, I have often heard the junior associate who tags along with the senior partner jokingly referred to as a "bag carrier," on the presumption that the junior associate's job is to do all the hard work for the partner. The junior associate not only carries the senior partner's briefcase, the junior associate also does all of the research, writing and legwork for which, it is presumed, the senior partner takes all the credit. In many cases we see, a senior partner appears to argue the case while a junior associate sits beside him/her at counsel's table. So, in a typical case, Ms. Altaf's presence would have been unremarkable.

But, in this case, Mr. Dombroff right out of the gate conceded that Mr. Khan had been exposed to the nastiest forms of discrimination by his fellow pilots, in part because of his Pakistani descent. Mr. Dombroff vociferously argued that what Mr. Khan's co-workers did to him was, while despicable, totally unknown to Colgan Air's senior management. Mr. Dombroff's argument was, essentially, that Colgan Air never engaged in discrimination, only certain bad apples in its employ engaged in discrimination. But, Mr. Dombroff's argument took a personal form: he argued that "we" think Mr. Khan was a victim of pernicious misconduct, that even so "we" didn't discriminate, and "we" got rid of the bad apples as soon as Mr. Khan drove all the way to Manassas, Virginia, to report the discrimination.

And at this point, Ms. Altaf's presence looked very much out of place. Ms. Altaf didn't look like the junior associate who did all the work on the case; instead, she looked like a prop or window dressing for Mr. Dombroff's argument that "we" didn't do anything to discriminate against Mr. Khan because of his Pakistani origin and, therefore, "we" shouldn't have to pay Mr. Khan any money for his suffering.

For that reason, at the close of Mr. Dombroff's argument I asked if Ms. Altaf was of Pakistani descent. When Mr. Dombroff answered in the affirmative, the audience giggled when I responded "I thought so," because it appears that some members of the neophyte audience had also been thinking the same thing.

I did not ask this question intending to embarrass Ms. Altaf because of her national origin; I intended to emphasize that Mr. Dombroff's argument style had crossed the line from reasoned to theatrical. My question did not reflect bias against Colgan Air, or bias against people of Pakistani origin; it reflected a bias against pomposity by lawyers appearing before appellate tribunals.

My reputation for promoting diversity in all aspects of the workplace and our social lives is well known. But, in hindsight, there may have been more artful ways for me to have asked the question and explained my thinking. I therefore apologize to Ms. Altaf; no offense was intended to her by my actions.

Still, I believe that the evidence in this case strongly supported the Commission's finding of overt discrimination against Mr. Khan by Colgan Air's employees; that the discrimination was timely reported to Colgan Air's management; and that management dallied and did nothing, until Mr. Khan took extraordinary actions to get relief. I therefore believe that the Commission was correct in awarding him monetary damages and attorney fees for this discrimination.

1. The firm is Dombroff Gilmore Jaques & French, P.C.